IN THE UNITED STATES DISTRICT COURT
THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| CAREY A. MANDERS | ) |
| | ) |
| | ) |
| | ) CIVIL ACTION FILE NO.: |
| Plaintiff, | ) _____ |
| | ) |
| v. | ) |
| | ) |
| | ) |
| ALTISOURCE, INC. | ) |
| | ) |
| | ) |
| Defendant. | ) |

# COMPLAINT

Plaintiff Carey A. Manders (the "Plaintiff" or "Ms. Manders") respectfully submits the following Complaint:

## INTRODUCTION

At all times relevant to this dispute, Altisource, Inc, (the "Defendant") is an integrated service provider and marketplace for the real estate and mortgage industries. It has offices all across the world including Atlanta, Georgia.

## JURISDICTION AND VENUE

1. Plaintiff's claims under the Fourteenth Amendment of the U.S. Constitution, actionable under 42 U.S.C. §1983, present federal questions over

1

which the Court has subject matter jurisdiction under 28 U.S.C. § 1331. This Court has supplemental jurisdiction over the Plaintiff's state law claims under 28 U.S.C. § 1367.

2. This court is a proper venue of the Plaintiff's claims under 28 U.S.C. 1391(b), because the Defendant resides in the Northern District of Georgia and because the unlawful conduct giving rise to these claims occurred in this District.

## THE PARTIES

3. The Defendant is a multi-national company with offices in different regions of the world including Atlanta, Georgia. The Defendant's address in Atlanta, Georgia is 1000 Abernathy Road NE, Atlanta, Georgia 30328. The Defendant employs about 22,000 people in the Atlanta area.

4. The Plaintiff is a black African woman who is originally from Kenya.

5. The Plaintiff's employment with the Defendant was terminated as of April 6, 2020.

6. She was treated differently and less favorably from similarly situated employees who were not in her protected class.

7. She was and remains qualified to work as a real estate broker and an auctioneer.

## FACTUAL ALLEGATIONS

8. The Plaintiff began working for the Defendant in May 2015 as a real estate broker and an auctioneer.

9. The Plaintiff was one of only two broker-auctioneers with the Defendant.

10. She was an exemplary employee on all accounts, with outstanding performance reviews, was very well-liked, and was often selected by her supervisors to spearhead new initiatives.

11. For instance, the Defendant regularly chose Ms. Manders for different special projects that required top performers like the "high asset value" team which was formed to help the Defendant regularly sell these high asset valued properties.

12. This project was a success with sales over $87.1 million in the first twelve months.

13. When the Defendant needed ideas on how to launch a new service which entailed marketing and selling certain kinds of assets, it called on the Plaintiff to serve on the Hubzu team.

14 The Hubzu team was tasked with finding creative ways to market and sell these properties through the Hubzu platform.

15. Upon information and belief, Plaintiff was the only broker handling the entire portfolio for the state of New Mexico for two whole years without incident and always was in compliance of all real estate regulations.

16. So, when a managerial position became available in the New Mexico office, Ms. Manders expected she would be appointed to manage that office since she was more than qualified for the position.

17. But, when the Defendant decided to fill the position, it gave the position to a newly licensed broker in New Mexico, a white male, James Samsing.

18. The Plaintiff asked the Defendant several times over several months why the job was ultimately given to Mr. Samsing but the Defendant never gave the Plaintiff an answer.

19. Upon information and belief, the Plaintiff was never paid a salary commensurate to her auctioneer experience and real estate broker experience.

20. There were always insinuations around the office that the brokers in the Atlanta office were "not up to par" to the standards found in other offices of the Defendant.

21. Upon information and belief, the brokers in Atlanta office (who were Black) were paid substantially less than other brokers in the other offices of the Defendant and did not receive all of the benefits that other brokers in other offices were provided with as part of their employment.

22. The Plaintiff's manager, Mr. Samsing, constantly made snarky, unprofessional remarks directed at her.

23. For instance, Mr. Samsing constantly made comments to the entire team that the Plaintiff "had the audacity to make more money than him."

24. Ms. Manders specifically raised concerns about a requirement by the state of Hawaii that a broker-in-charge had to be at the state's office location every thirty (30) days if the brokerage is conducting business in Hawaii.

25. Upon information and belief, during May 2019, the Hawaii Real Estate Commission performed an audit of the Defendant's Hawaii operations and found it was non-compliant with the broker-in-charge requirement.

26. The Plaintiff's manager ignored her concerns and refused to act on the information from the Hawaii Real Estate Commission.

27. As a result of the Hawaii Real Estate Commission's audit, the Defendant required Hawaii brokers to be present in the office every day.

28. Out of the four (4) brokers in Hawaii, only three (3), including the Plaintiff, were scheduled to rotate weekly travel which put a huge strain on those brokers since the prior rotation was monthly.

29. Furthermore, with the frequent trips to Hawaii, Plaintiff was expected to pay for all expenses upfront and request reimbursement after completing each trip.

30. The expenses for each trip regularly exceeded her monthly pay and she had to make these trips once every three weeks as required by the Defendant.

31  Mr. Samsing and the other managers refused to approve any actions to that would lighten her burdens.

32. Also, Mr. Samsing made the Plaintiff's life far more difficult by declining her reimbursement for her travel expenses to and from Hawaii six (6) different times even though the reimbursements had already been approved by his boss.

33. Mr. Samsing also would regularly remark on "how nice it must be to be sent to Hawaii to work out of a hotel on Waikiki Breach" and that "he should in fact get a Hawaii license" so he could begin regular trips to Hawaii.

34. Furthermore, Mr. Samsing and his manager, Mr. Mason Legendre, continued to refuse to approve Plaintiff's reimbursements for her trips to Hawaii even though (i) she provided all of the requested information; and (ii) no one else had to face protracted back-and-forth conversations with senior management.

35. Furthermore, Plaintiff and Courtney Mitchell Reed, a broker in Tennessee ("Ms. Reed"), were licensed in the state of Hawaii and both women took turns (along with two other broker) going to Hawaii to handle the Defendant's business on a weekly basis.

36. As the coronavirus was started to spread across the country, the Defendant made a decision not to send Ms. Reed to Hawaii because she needed to be protected from the coronavirus.

37. But the Defendant insisted the Plaintiff continue to travel to Hawaii.

38. This was even after the Plaintiff protested the decision to continue traveling with COVID-19, which was exposing her and other people to all kinds of infections and other health concerns.

39. The Defendant also chose to focus on several incidents where Plaintiff's "unapproved leaves of absences" during October 2018, February 10 – February 26, 2020, and March 18 – March 27, 2020.

40. For instance, during her grandmother's critical illness and general decline in her health, Ms. Manders found herself dealing with heart palpitations and anxiety.

41. The Plaintiff was driven to the hospital where she was immediately admitted into the hospital.

42. Before the nurses took away her cellphone number and other electronic devices, Plaintiff had the presence of mind to contact her qualified broker, Ms. Summer Frazier ("Ms. Frazier"), tell her she was being admitted to the hospital, and handed over to Ms. Frazier all of the information she felt other brokers would need to take over any sales going on.

43. The Plaintiff specifically told Ms. Frazier to inform Mr. Samsing of her hospitalization, which Ms. Frazier did.

44. Mr. Samsing instead chose to make the statement "I see Carey is MIA" during a team meeting in front of the Plaintiff's colleagues.

45. The Plaintiff was hospitalized for a week or so.

46. However, when Plaintiff returned to work a week later, the Defendant told her to not log into any company system until she provided a doctor's note documenting her time off.

47. Upon her return she spoke to a couple of senior leaders and one of them suggested she have a meeting with the brokerage Director Mason Legendre in hopes of gaining some understanding as to why she was getting such unfair and cruel treatment.

48. The meeting was scheduled for Tuesday. March 2, 2020, which was a day before she was scheduled to fly to Hawaii for company business.

49. On March 3, 2020, Plaintiff was sent off to Hawaii to transact the Respondent's business while coronavirus/COVID-19 was starting to spread.

50. The Plaintiff protested to Mr. Samsing and his boss, Mr. Legendre, about the unnecessary risks in sending her (or any other broker) to Hawaii, but they were adamant in requiring her to continue going to Hawaii.

51. Plaintiff was contacted by the state of Hawaii on March 18, 2020, to inform her that she had been exposed to the virus.

52. On March 19, 2020, Ms. Manders informed her managers she needed a few days to get tested since she was experiencing symptoms of COVID-19.

53. On March 20, 2020, she found an urgent care facility where tests could be conducted.

54. While in the waiting room of the urgent care facility, she received an e-mail from Aleesha Barber informing her that since she was working remotely, she should be able to return to work 'without skipping a beat.'"

55. However, while the Plaintiff was following the doctor's orders to quarantine for two weeks, she received a telephone call from Mr. Samsing on April 6, 2020, during which she was informed she was being laid off due to "the lack of work."

56. The Defendant claims the Plaintiff was terminated on account of her "substandard performance."

57. It also claimed Plaintiff was terminated "in response to the pandemic."

58. At the same time, Defendant claimed the Plaintiff was let go due to "a lack of work" as stated on her separation notice filed with the Georgia Department of Labor.

59. The Defendant's varying reasons are clearly indicative of acting under a pretext.

60. Plaintiff believes her termination was on account of race and national origin but the Defendant used "a lack of work" and "substandard performance" as the pretexts.

61. But, if that were the case, there would have been a clear history in the Defendant's records showing such substandard performance including write-ups and admonitions from her superiors highlighting such "substandard performance".

62. There also would be oral and written records of conversations, performance improvement plans, etc. of the Plaintiff's job performance.

63. These records simply do not exist or else the Defendant would have presented them to the EEOC as part of its response to the Plaintiff's charge of discrimination.

## Punitive Damages Allegations

64. Defendant undertook all of the above-pled unlawful conduct intentionally, willfully, and maliciously with respect to the Plaintiff and her federally protected rights.

65. Additionally, and in the alternative, the Defendant undertook all of the above-pled conduct with reckless disregard for the Plaintiff and her federally protected rights.

## COUNT I
## Race Discrimination and National Origin Discrimination
## (42 U.S.C. § 1983 against Defendant)

66. Plaintiff incorporates each of the above factual allegations as if restated here.

67. The Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States of America entitles the Plaintiff to equal protection under the laws regardless of her race.

68. Defendant violated the Plaintiff's rights to equal protection by, among other things subjecting her to a racially discriminating environment.

69. Furthermore, Defendant violated the Plaintiff's equal protection rights by failing to take any preventative and/or corrective measures with respect to the discriminatory behavior.

70. As a direct and proximate result of all of the Defendant's actions, the Plaintiff suffered damages including emotional distress, inconvenience, loss of income and benefits, and other indignities.

## COUNT II

### Punitive Damages O.C.G.A. § 51-12-5.1

### (Against the Defendant)

71. Plaintiff re-alleges the preceding paragraphs as if fully set forth herein.

72. The Defendant's above-pled actions were willful, malicious, and oppressive within the meaning of O.C.G.A. § 51-12-5.1(b).

73. Additionally, and in the alternative, Defendant's actions display within the meaning of that statute, an entire want of care indicative of a conscious indifference to its actions' consequences.

## COUNT III

### Attorneys' Fees and Expenses of Litigation

### O.C.G.A. § 13-6-11 (Against the Defendant)

74. The Plaintiff re-alleges the preceding paragraphs as if fully set forth herein.

75. The Defendant acted in bad faith, have been stubbornly litigious, and/or caused the Plaintiff unnecessary trouble and expense in litigating this case, and the Plaintiff is thus entitled to recover the expenses of this litigation, including attorneys' fees under Georgia law, including but not limited to O.C.G.A. § 13-6-11.

## PRAYER FOR RELIEF

The Plaintiff respectfully requests the following relief:

a. A declaratory judgement that the Defendant violated the Plaintiff's rights under Title VII of the Civil Rights Act of 1964 and under the Equal

Protection Clause of the Fourteenth Amendment of the Constitution of the United States of America;

    b.    An injunction prohibiting the Defendant from engaging in such unlawful conduct in the future;

    c.    Compensatory damages, in an amount to be determined by the jury, for Plaintiff's emotional distress, suffering, inconvenience, mental anguish, loss of enjoyment of life, and special damages;

    d.    Punitive damages against the Defendant, in an amount to be determined by the jury to be sufficient to punish the Defendant for its conduct towards the Plaintiff and deter it from similar conduct in the future;

    e.    Reasonable attorneys' fees and costs; and

    f.    Other and further relief as the Court deems just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Respectfully submitted this Twenty-first Day of October 2021.

        **SMITHERS + UME-NWAGBO, LLC**

        /s/Nwabundo Ume-Nwagbo
        Nwabundo E. Ume-Nwagbo
        Georgia Bar No. 721655
        Telephone: 404-418-8492 x103
        Email: neu@stulawgroup.com

        2451 Cumberland Parkway, SE
        Suite 3836

Atlanta, GA 30339
Facsimile: 404-736-6063

_____
Attorney for the Plaintiff

# **CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY that I have on this date, October 21st, 2021, served a copy of the foregoing Complaint as COUNSEL OF RECORD FOR PLAINTIFF**, upon all parties counsel of record by depositing a true and correct copy of same to the United States mail, with adequate postage thereon, and/or by statutory electronic service and addressed as follows:

> **Chiaman Wang**
> **Counsel**
> **Altisource Inc.**
> **1000 Abernathy Rd NE,**
> **Atlanta, GA 30328**

Respectfully submitted dated Twenty-first Day of October, 2021.

> **SMITHERS + UME-NWAGBO, LLC**
>
> /s/Nwabundo Ume-Nwagbo
> Nwabundo E. Ume-Nwagbo
> Georgia Bar No. 721655
> Telephone: 404-418-8492 x103
> Email: neu@stulawgroup.com
>
> 2451 Cumberland Parkway, SE
> Suite 3836
> Atlanta, GA 30339
> Facsimile: 404-736-6063
>
> Attorney for the Plaintiff